UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| DIAMOND WILLIAMS | ) | |
| PLAINTIFF, | ) | Case No. |
| v. | ) | Hon. |
| MASTRONARDI PRODUCE-USA, INC. | ) | |
| DEFENDANT. | ) | |

## PLAINTIFF'S COMPLAINT

For her Complaint against Defendant, Plaintiff Diamond Williams, states as follows:

## JURY DEMAND

COMES NOW Plaintiff Diamond Williams and hereby demands trial by jury.

## PARTIES AND JURISDICTION

1. At all times relevant to this Complaint, Plaintiff Diamond Williams was a resident of Michigan.

2. Defendant Mastronardi Produce-USA, Inc. ("Defendant") is a Michigan corporation that does business at 28700 Plymouth Rd, Livonia, MI.

It is a subsidiary of Mastronardi Produce, Ltd., a Canadian entity, and Defendant, upon information and belief, is a joint employer with Mastronardi Produce, Ltd.

3. Venue is proper in this Court, because the violations giving rise to Plaintiff's claims occurred in this district.

4. This action is brought in this Court on the basis of federal question jurisdiction pursuant to 42 U.S.C. § 1981.

5. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's state law claims.

## FACTUAL ALLEGATIONS

6. Plaintiff Diamond Williams ("Plaintiff") is an African-American woman who was first employed by Defendant on or about February 4, 2020.

7. Ms. Williams worked for Sunset for about three years, during which she began to experience harassment and retaliation after she was promoted to supervisor and reported her Production Manager for sexual harassment, discrimination and retaliation, and other supervisors for sexual harassment and discrimination.

8. Ms. Williams mistakenly believed that reporting the actions of the Production Manager to senior management at that time would cause the behavior to cease.

9. However, almost immediately after reporting the issues, she experienced a variety of adverse work events.

10. On or about early 2022, Plaintiff began hearing rumors that Jeff Emberton, production supervisor, had performed a sexual act on her and told others that he would “f*** the s*** out of” her.

11. However, Margherita Hays in Defendant’s human resources department told her that the findings could not be substantiated and otherwise did nothing.

12. Upon information and belief, others employees have reported sexual comments made by Emberton.

13. In the summer of 2022, Plaintiff’s production manager, Johnny Galarza, began asking vulgar questions about her relationship between her and her partner.

14. Ms. Williams asked him why he was asking her such questions, as she did not think that it was appropriate.

15. Galarza would call Ms. Williams’ cell phone and her partner would become upset and yell in the background for him to stop calling her.

16. In approximately November of 2022, Galarza called Ms. Williams when he knew her partner was out of town, and he began to question her about photos on her personal social media account.

17. Galarza said to her, “so you don’t like to get f***ed with the strap at all?”

18. At work, Galarza also asked her personal questions about whether she enjoyed “dildos.”

19. When Ms. Williams would avoid the questions and comments, Galarza would begin to treat her differently at work.

20. Galarza would let her know that he could not let younger Black women work on the line with Ms. Williams because she may try to “eat [their] p****.”

21. He also referred to her and other women as “dykes.”

22. Galarza would also let Ms. Williams know he would continue to make advances towards her although she was not interested in him.

23. Upon information and belief, Defendant’s upper management was aware of this conduct by Galarza and did nothing about it.

24. Ms. Williams was scared to go to HR after nothing happened when she had advised them of Emberton’s behavior.

25. Ms. Williams addressed Galarza, asking why he was treating her this way, and he did not respond.

26. Approximately a week before Ms. Williams went to HR, Galarza made a comment over the radio saying that he would have Ms. Williams "lick [another supervisor's] a**."

27. Ms. Williams decided to go to Galarza's manager on December 29, 2022 about the behavior and actions of Galarza, and that she had been banned from a certain side of the warehouse, and was generally being treated differently than other supervisors.

28. Galarza's manager told Ms. Williams that he would talk to Galarza, but on the next day, Ms. Williams was written up.

29. After Ms. Williams and others told Galarza that they would report him to HR, he would try to intimidate them by saying "Go ahead, I'll call them for you!" Ms. Williams informed HR of this, as well.

30. Galarza would also name other employees who had reported him to HR previously, told her that she could "join the list," and he said he did not care and had been to HR numerous times.

31. Ms. Williams was expecting to hear back from the manager about what she had reported, to follow the chain of command.

32. When she did not hear anything, and after Galarza retaliated against her, she went and reported the above to HR.

33. Upon information and belief, nothing was done yet again.

34. Further there have been sexual incidents involving other employees.

35. Ms. Williams had a white male coworker named "William" who worked on the line

36. Billy told Ms. Williams that Galarza asked him if he had ever had "Black p****" before.

37. Galarza and Rick Patino, Defendant's production manager, told William not to say anything if he was asked about the incident.

38. William came up to Ms. Williams asking what he should do because he did not want to lose his job for telling the truth.

39. Many of Ms. Williams' coworkers witnessed the sexual questions Galarza would ask different men and women.

40. Galarza would ask them have they done different sexual actions to the same or opposite sex.

41. Galarza would do this constantly although Ms. Williams had reported this behavior to HR, nothing was done.

42. In another incident, a co-worker alleged that William was recording Black co-workers in the restroom.

43. William was again scared of losing his job over this situation, and he told Ms. Williams' sister that he had told Patino that he mentioned the recording of

males in the bathroom to her, to which Patino responded by telling William to stop speaking about it.

44. Later, Galarza told Ms. Williams to take William's phone so he could not have it in the bathroom.

45. Galarza also told Ms. Williams to write a statement about this situation once it appeared that HR would investigate.

46. Ms. Williams' sister told William that he should let them have his phone so that he did not have any further issues.

47. Further, Galarza went to HR about the situation when things began to continue, as Ms. Williams had told him about the situation.

48. Upon information and belief, William still works there and has not faced any repercussions for his actions.

49. Although Ms. Williams had reported Galarza before about the sexual comments being made about her through the workplace, Defendant's HR continued to allow Galarza to work without any reprimand.

50. When the comments continued to go on, Ms. Williams contemplated going to HR numerous times before going for fear of losing her job.

51. Ms. Williams tried to ignore Galarza and have a courteous work relationship, but he continued to harass her.

52. Further, Ms. Williams and other Black employees have endured a racially hostile and insensitive work environment, including racially-motivated comments, and are treated less favorably than their non-Black counterparts.

53. Upon information and belief, Plaintiff was paid less in her role than other similarly situated white supervisors.

54. In one racial incident, Emberton came up to William and asked him "why are Black basketball players so tall?" When William asked why, Emberton said it was because "they're 'knee grows,'" referring to the term "negroes."

55. The incident in which Galarza came up to William and asked him if he had ever had "Black p****" before, within earshot of other coworkers, was both racial as well as sexual in nature.

56. Emberton would also ask Ms. Williams why Black "girls" had names like "LaTisha" or "LaQuanda."

57. On another occasion, Ms. Williams asked Chris Felosak, production supervisor (whom Galarza referred to by an anatomical term) if he had eaten chicken that was given to the employees, and he told her that he was trying to "fit in with y'all."

58. Ms. Williams asked what he meant by "y'all" and he clarified that he meant Black people, again playing upon racial stereotypes.

59. In another incident which was recorded and sent to Ms. Williams by another co-worker, when the electricity went out at the job, Galarza asked Ms. Williams to go through the window to open the door.

60. When she successfully made it through the window, Felosak made a comment that he knew a "Black girl could do it" which caused everyone to laugh.

61. Ms. Williams did not know he had made that comment until she saw the video.

62. Ms. Williams has been called "skinny Black b*****", "ghetto Black b*****", told that she does not have "hips and a*** for a Black girl," a "dyke," and most recently referred to as a "monkey," by Defendant's production supervisor and/or manager.

63. Plaintiff reported all incidents (other than the monkey comment, which was recently reported) to HR, about which nothing was done.

64. Ms. Williams went to HR several times about these situations:

65. On December 29, 2022, Ms. Williams spoke with Senior Manager at the time, "Slim," about Galarza and how he banned Ms. Williams from one side of the warehouse.

66. Ms. Williams also told him about some of the information related to Galarza's comments and conduct on the job towards her.

67. Ms. Williams let Slim know that Galarza continued to treat her differently, and Slim let her know he would handle Galarza.

68. However, the next day, on December 30, 2022, after Ms. Williams spoke to Slim about the harassment issues related to Galarza, Ms. Williams was written up by Galarza for unacceptable conduct and poor job performance.

69. Ms. Williams did not know about the write-up until she received it the following day on December 31, 2022.

70. Ms. Williams continued to be written up after this incident, as noted below.

71. Later, Ms. Williams sent HR an email statement about the discrimination and harassment as well as about the write up.

72. She then met with Margherita Hay and Senior Manager at the time, Slim, when they returned to work.

73. Ms. Williams told them about the different treatment, sexual and racial comments, and the write-up.

74. In January of 2023, HR found that Galarza had violated the anti-harassment policy and removed the write-up from December 2022 from her employment record.

75. However, Galarza continued to retaliate against and write up Ms. Williams and continued harassing her.

76. Ms. Williams sent a message to the Senior Manager, West, to let him know the harassment was still ongoing.

77. She also wanted to meet after she returned from vacation to discuss the treatment in March 2023.

78. Ms. Williams was further retaliated against by being moved to an undesirable line rather than dealing with the issues.

79. After she went to HR about his conduct, Galarza continued to harass and discriminate against Ms. Williams.

80. Galarza wrote her up again but put another Manager's name, Patino, on the write up.

81. Patino told Ms. Williams that he did not know about the write up nor did he tell Galarza to write up Ms. Williams.

82. Further, Ms. Williams has recently become aware of other racially discriminatory comments that have been made about her.

83. She has also witnessed harassment and discrimination against other supervisors and employees on the basis of their protected class.

84. In one incident, a male employee of Arabic descent has been subjected to comments about his sexuality, including comments regarding giving him a "butt plug" for Christmas.

85. Upon information and belief, after Plaintiff informed Defendant of her intentions to take legal action related to the above, Defendant and/or its counsel hired a third-party investigator to speak with employees for Defendant, including Plaintiff and the Arabic employee, who, upon information and belief, confirmed Ms. Williams' comments were true.

86. Despite the fact that the Arabic employee has been the victim of discrimination himself, he was written up just a few days after speaking with the third-party who was hired.

87. Further, though Plaintiff is currently still employed, and although the investigative process was purported to be confidential, other co-workers have stated that no one likes Plaintiff because she has been going to HR, and that she is on her "last leg."

88. Plaintiff files suit seeking redress for the above conduct as follows.

**COUNT I**
**RACIAL DISCRIMINATION IN VIOLATION OF 42 USC § 1981**

89. Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint, as if fully set forth herein.

90. 42 USC § 1981 prohibits employers from intentionally discriminating against individuals, including employees, in the making and enforcement of contracts.

91. Defendant's discrimination against Plaintiff as described above is in violation of the rights of Plaintiff afforded her by the U.S. Constitution and the Civil Rights Act of 1866, 42 USC § 1981, as amended by the Civil Rights Act of 1991.

92. By the conduct described above, Defendant intentionally deprived Plaintiff of the same rights as are enjoyed by individuals who are non-African American, to the creation, performance, enjoyment, and all benefits and privileges of their contractual employment relationship with Defendant, in violation of 42 USC § 1981.

93. The intentional discrimination on the basis of Plaintiff's race by Defendant that Plaintiff experienced included subjecting her to harassment and a hostile work environment, moving her to an undesirable job, and failing to promote her, which broke the contract between the parties.

94. The actions of Defendant and its agents were willful, intentional, in deliberate disregard of and with reckless indifference to the rights and sensibilities of Plaintiff.

95. As a direct and proximate result of those actions, the terms, conditions, and privileges of Plaintiff's employment were adversely affected.

96. As a direct and proximate result of Defendant's wrongful acts, Plaintiff sustained injuries and damages including, but not limited to, loss of

earnings and earning capacity, loss of career opportunities, loss of fringe and pension benefits, outrage and humiliation, mental anguish, anxiety about their future, physical and emotional distress, loss of professional reputation and loss of the ordinary pleasures of everyday life.

## COUNT II
## DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101 et seq. ("ELCRA")

97. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

98. At all material times, Defendant was an employer and Plaintiff was an employee covered by, and within the meaning of, ELCRA.

99. Defendant's conduct, as alleged herein, violated the ELCRA, which makes it unlawful to harass or discriminate against an employee on the basis of that employee's race or skin color.

100. Plaintiff is an African American woman, and, as a result, is a member of a protected class pursuant to ELCRA.

101. Plaintiff was subjected to offensive communication and/or conduct on the basis of her membership in this protected class, including but not limited to moving her to undesirable positions and failing to promote her to other positions with Defendant and/or Mastronardi Produce, Ltd., which Defendant has the ability to control.

102. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

103. The unwelcomed conduct and communication was intended to and in fact did substantially interfere with Plaintiff's employment and created an intimidating, hostile, and/or offensive work environment as alleged in the statement of facts.

104. As a direct and proximate result of the Defendant's wrongful acts and omissions, Plaintiffs have sustained loss of earnings, earning capacity, and fringe benefits and have suffered mental anguish, emotional distress, humiliation and embarrassment, and loss of professional reputation.

105. Plaintiff requests relief as described in the Prayer for Relief below.

**COUNT III**
**RETALIATION IN VIOLATION OF THE ELCRA (GENDER)**

106. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

107. At all material times, Plaintiff was an employee, and Defendant was her employer covered by, and within the meaning of, the ELCRA.

108. A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

109. Defendant's conduct, as alleged herein, violated the ELCRA which makes it unlawful to retaliate against an employee who has engaged in protected activity.

110. Plaintiff engaged in protected activity, as more fully laid out in the statement of facts, including but not limited to when Plaintiff reported sexual harassment to her managers, other decisions makers, and HR.

111. Defendant, through its agents, had knowledge that Plaintiff engaged in protected behavior because she reported the issue directly to multiple agents of Defendant.

112. After Plaintiff engaged in protected activity, Defendant's agents thereafter took adverse employment actions against Plaintiff, as alleged in the statement of facts, including but not limited to moving her position and failing to promote her.

113. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard of Plaintiff's rights.

114. Plaintiff notified Defendant and its agents of the unwelcomed conduct and communication; however, Defendant failed to remedy the same.

115. As a proximate result of Defendant's discriminatory and retaliatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

116. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

117. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT IV
## RETALIATION IN VIOLATION OF THE ELCRA (RACE)

118. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

119. At all material times, Plaintiff was an employee, and Defendant was her employer covered by, and within the meaning of, the ELCRA.

120. A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

121. Defendant's conduct, as alleged herein, violated the ELCRA which makes it unlawful to retaliate against an employee who has engaged in protected activity.

122. Plaintiff engaged in protected activity, as more fully laid out in the statement of facts, including but not limited to when Plaintiff reported racially offensive comments to her managers, other decisions makers, and HR.

123. Defendant, through its agents, had knowledge that Plaintiff engaged in protected behavior because she reported the issue directly to multiple agents of Defendant.

124. After Plaintiff engaged in protected activity, Defendant's agents thereafter took adverse employment actions against Plaintiff, as alleged in the statement of facts, including but not limited to moving her position and failing to promote her.

125. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard of Plaintiff's rights.

126. Plaintiff notified Defendant and its agents of the unwelcomed conduct and communication; however, Defendant failed to remedy the same.

127. As a proximate result of Defendant's discriminatory and retaliatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

128. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

129. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT V
## GENDER/SEXUAL HARRASMENT/DISCRIMINATION IN VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101 et seq. ("ELCRA")

130. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

131. At all material times, Defendant was an employer covered by, and within the meaning of the Elliott-Larsen Civil Rights Act ("ELCRA"), as amended.

132. Defendant's conduct, as alleged herein, violated ELCRA, which makes it unlawful to sexually harass or discriminate against an employee.

133. A respondeat superior relationship existed because Plaintiff's supervisors, had the ability to undertake or recommend tangible decisions affecting Plaintiff or the authority to direct Plaintiff's daily work activity as alleged in the statement of facts.

134. Plaintiff is a woman and a member of a protected class.

135. Plaintiff was subjected to communication or conduct on the basis of her gender, as indicated in the facts above.

136. Multiple male supervisors made sexual advances, explicit comments, and gestures, including touching Plaintiff, which were all unwelcomed.

137. The unwelcomed conduct or communication was intended to or in fact did substantially interfere with the Plaintiff's employment or created an intimidating, hostile, or offensive work environment as alleged in the statement of facts.

138. Plaintiff notified Defendant and/or Defendant's agents of the unwelcomed conduct and communication and Defendant failed to remedy the unwelcomed conduct or communication.

139. As a direct and proximate result of Defendant's and Defendant's agent's wrongful acts and omissions, Plaintiff has sustained loss of earnings,

earning capacity, and fringe benefits and has suffered mental anguish, emotional distress, humiliation and embarrassment, and loss of professional reputation.

**COUNT VI**
**DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101 et seq. ("ELCRA")**

140. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

141. At all material times, Defendant was an employer and Plaintiff was an employee covered by, and within the meaning of, ELCRA.

142. Defendant's conduct, as alleged herein, violated the ELCRA, which makes it unlawful to harass or discriminate against an employee on the basis of that employee's race or skin color.

143. Plaintiff is an African American woman, and, as a result, is a member of a protected class pursuant to ELCRA.

144. Plaintiff was subjected to offensive communication and/or conduct on the basis of her membership in this protected class as set forth in the factual allegations.

145. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

146. The unwelcomed conduct and communication was intended to and in fact did substantially interfere with Plaintiff's employment and created an

intimidating, hostile, and/or offensive work environment as alleged in the statement of facts.

147. As a direct and proximate result of the Defendant's wrongful acts and omissions, Plaintiffs have sustained loss of earnings, earning capacity, and fringe benefits and have suffered mental anguish, emotional distress, humiliation and embarrassment, and loss of professional reputation.

148. Plaintiff requests relief as described in the Prayer for Relief below.

**COUNT VII**
**HOSTILE WORKPLACE ENVIRONMENT IN VIOLATION OF THE MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101 et seq. ("ELCRA")**

149. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

150. At all material times, Plaintiff was an employee, and Defendant was her employer covered by, and within the meaning of, the ELCRA.

151. A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

152. Defendant's conduct, as alleged herein, violated the ELCRA which makes it unlawful to create a work environment that a reasonable person would consider intimidating, hostile, or abusive.

153. Plaintiff's work environment, as alleged in the statement of facts made Plaintiff's work environment extremely hostile on the basis of race and due to the sexual harassment she experienced, as well as the retaliation she suffered.

154. Moreover, Plaintiff's continual attempts to have the situation remedied, coupled with Defendant's ability to ignore Plaintiff's grievances have made the situation untenable.

155. Additionally, Defendant treated African American female employees, such as Plaintiff, in a hostile, intimidating, and offensive way.

156. The unwelcomed conduct and communication was intended to, or in fact did, substantially interfere with Plaintiff's employment, and created an intimidating, hostile, or offensive work environment, as alleged in the statement of facts.

157. As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

158. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

159. Plaintiff requests relief as described in the Prayer for Relief below.

## RELIEF REQUESTED

PLAINTIFF, DIAMOND WILLIAMS, respectfully requests that this Honorable Court enter judgment against Defendant as follows:

1. Compensatory damages in whatever amount to which Plaintiff is entitled;

2. Exemplary damages in whatever amount which Plaintiff is entitled;

3. An award of lost wages and the value of fringe benefits, past and future;

4. An award of interest, costs, and reasonable attorney fees; and

5. An order awarding whatever other equitable relief appears appropriate at the time of final judgment.

Dated: December 2, 20234 Respectfully Submitted,

CARLA D. AIKENS, P.L.C.

/s/ *Carla D. Aikens*
Carla D. Aikens (P69530)
Austen J. Shearouse (P84539)
615 Griswold St., Ste. 709
Detroit, MI 48226
carla@aikenslawfirm.com
austen@aikenslawfirm.com
*Attorneys for Plaintiff*